THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* RAYMOND MARTINEZ FERNANDEZ and MARTHA JULE BECK, Appellants.

Argued April 3, 1950; decided July 11, 1950.

*John McKim Minton* and *Rudolph Stand* for Raymond M. Fernandez, appellant. I. It was reversible error for the trial court to assign the employed counsel of defendant Beck to represent defendant Fernandez, because their interests conflicted, thereby depriving defendant Fernandez of a trial conformable to the requirements of due process of law. (*People* v. *Snyder,* 297 N. Y. 81; *People* v. *Fuller,* 35 Misc. 189; *Glasser* v. *United States,* 315 U. S. 60; *People* v. *Lanigan,* 22 Cal. 2d 569; *State* v. *Hudson,* 55 R. I. 141; *People* v. *Hull,* 251 App. Div. 40; *Von Moltke* v. *Gillies,* 332 U. S. 708.) II. The trial court should have excluded Fernandez' alleged confession as a matter of law. In any event, the court failed adequately to instruct the jury with respect to Fernandez' contention that the confession was induced by promises of immunity made to him by the prosecuting authorities of Michigan and New York. (*United States* v. *Bayer,* 331 U. S. 532; *McNabb* v. *United States,* 318 U. S. 332; *People* v. *Reilly,* 181 App. Div. 522, 224 N. Y. 90; *Flamme* v. *State,* 171 Wis. 501; *Lyons* v. *Oklahoma,* 322 U. S. 596; *People* v. *Odell,* 230 N. Y. 481; *People* v. *Montesanto,* 236 N. Y. 396; *Andres* v. *United States,* 333 U. S. 740; *People* v. *Kennedy,* 159 N. Y. 346.) III. The trial court's summary rejection of thirty-two jurors on the People's challenges for cause was in direct contravention of the explicit provisions of subdivision 8 of section 377 of the Code of Criminal Procedure and requires a reversal of this judgment. (*People* v. *Carolin,* 115 N. Y. 658; *People* v. *Wood,* 131 N. Y. 617; *People* v. *McQuade,* 110 N. Y. 284; *Hildreth* v. *City of Troy,* 101 N. Y. 234.) IV. It was an abuse of discretion for the Trial Judge to permit defendant Fernandez to be questioned twice on separate occasions concerning a similar crime in Michigan. (*People* v. *Pettanza,* 207 N. Y. 560.) V. It was prejudicial error to receive in evidence the confession of defendant Beck made to the psychiatrists who were sent by the District Attorney, without the knowledge or consent of her counsel, to conduct a mental examination of her in jail. (*People* v. *Esposito,* 287 N. Y. 389; *Peo-*

*ple* v. *Kemmler,* 119 N. Y. 580; *People* v. *Hill,* 195 N. Y. 16; *People* v. *Austin,* 199 N. Y. 446; *People* v. *Sliney,* 137 N. Y. 570; *People* v. *Furlong,* 187 N. Y. 198.)

*Herbert E. Rosenberg, Cyril M. Rosenberg, Edward Norwalk* and *Eve J. Epstein* for Martha J. Beck, appellant. I. Prejudicial reversible error was committed by the Trial Judge in rejecting prospective jurors over counsel's objection and exception solely by reason of their opposition to capital punishment. (Code Crim. Pro., §§ 377, 380; *Hildreth* v. *City of Troy,* 101 N. Y. 234; *People* v. *McQuade,* 110 N. Y. 284; *People* v. *Bodine,* 1 Denio 281; *People* v. *Carolin,* 115 N. Y. 658; *People* v. *Wood,* 131 N. Y. 617; *Boyington* v. *State of Florida,* 74 Fla. 258; *Savage* v. *State,* 18 Fla. 909; *People* v. *Stewart,* 7 Cal. 140.) II. Introduction into evidence of alleged unsigned, unread, unseen confessions of defendant Beck, the result of a relentless and persistent long process of questioning and the product of sustained pressure and promises, while at the same time denying to her the right of family, friends and counsel, and the failure to advise her of her constitutional rights, including the right to remain silent, violated section 395 of the Code of Criminal Procedure and constituted a denial of due process of law under the State Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. (*Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227; *Malinski* v. *New York,* 324 U. S. 401; *Haley* v. *Ohio,* 332 U. S. 596; *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68.) III. The issue of the voluntariness of the confessions was improperly submitted to the jury. (*People* v. *Mummiani,* 258 N. Y. 394.) IV. It was reversible error highly prejudicial to defendants for the trial court to limit examination of the former District Attorney of Nassau County and the Nassau County police official and permit expressions of opinion by prosecution witnesses as to the particular cause of death. (*People* v. *Gleitsmann,* 361 Ill. 165; *People* v. *Rongetti,* 338 Ill. 56; *Matter of Hopkins,* 172 N. Y. 360; *Ferguson* v. *Hubbell,* 97 N. Y. 507; *Pearce* v. *Stace,* 207 N. Y. 506; *Kennedy* v. *People,* 39 N. Y. 245; *People* v. *Grutz,* 212 N. Y. 72; *People* v. *Creasy,* 236 N. Y. 205; *People* v. *Barber,* 115 N. Y. 475.) V. The trial court's interruptions of counsel, its extended cross-examination of defendants, its comments and

questions calculated to ridicule defendants and defendants' attorney, its curtailment of examination were so prejudicial as to deprive defendants of a fair and impartial trial and constitute reversible error. (*People* v. *Kinney,* 202 N. Y. 389; *People* v. *Becker,* 210 N. Y. 274; *People* v. *Van Zandt,* 224 N. Y. 354; *People* v. *Esposito,* 224 N. Y. 370; *People* v. *Montesanto,* 236 N. Y. 396; *People* v. *Buchalter,* 289 N. Y. 181; *People* v. *Sobieskoda,* 235 N. Y. 411; *People* v. *Buzzi,* 238 N. Y. 390.)

*Frank A. Gulotta, District Attorney* of Nassau County (*Philip Huntington* and *Henry P. DeVine* of counsel), for respondent. I. The evidence establishes beyond any reasonable doubt that defendants, each aiding and abetting the other, killed Mrs. Fay; and further, that the killing was an intentional, deliberate and premediated act of defendants. II. The confessions of defendants were properly received in evidence, were properly submitted to the jury, and were properly found to be voluntary and not made under any promise of immunity. (*People* v. *Doran,* 246 N. Y. 409; *People* v. *Reilly,* 224 N. Y. 90.) III. Defendants had a fair trial and there is no reversible error in the record. IV. There is no merit in the claim that the assignment of Mr. Rosenberg as attorney for defendant Fernandez, at the commencement of the trial, constitutes reversible error. (*People* v. *Schmidt,* 216 N. Y. 324; *People* v. *Milne,* 253 App. Div. 768; *People* v. *Snyder,* 246 N. Y. 491; *People* v. *Creighton,* 271 N. Y. 263.) V. There was no prejudicial error in the trial court's sustaining the challenges by the People as to jurors who were opposed to capital punishment. (*Hildreth* v. *City of Troy,* 101 N. Y. 234; *People* v. *McQuade,* 110 N. Y. 284; *People* v. *Carolin,* 115 N. Y. 658; *Butler* v. *Glens Falls, S. H. & F. E. S. R. R.-Co.,* 121 N. Y. 112.) VI. The charge was amply sufficient and contains no reversible error. (*People* v. *Odell,* 230 N. Y. 481; *People* v. *Montesanto,* 236 N. Y. 396.)

LEWIS, J. On the night of March 1, 1949, the dead body of a woman—with bent head and flexed limbs tightly bound against the torso, and with a white scarf knotted twice around the neck—was exhumed from beneath the concrete floor of a private house on 149th Street in South Ozone Park, Queens County, New York. An autopsy disclosed a fractured larynx and two head wounds which penetrated the cranial cavity and pierced those membranes which overlie the brain.

The body was that of Janet J. Fay who had met her death in a manner, presently to be described, which has given rise to this criminal prosecution.

The two defendants-appellants Raymond Martinez Fernandez and Martha Jule Beck now stand convicted of murder in the first degree upon an indictment by a Grand Jury of Nassau County which charged that on or about January 4, 1949, in the town of Hempstead, Nassau County, each of the defendants "then and there aiding and abetting the other, wilfully, feloniously, and of malice aforethought, killed one Janet J. Fay by then and there striking [her] with a hammer, and * * * strangling [her] with a * * * scarf * * *."

By reason of local prejudice aroused in Nassau County against the defendants, the venue was moved to Bronx County where a trial of ten weeks' duration produced a record of more than 4,000 pages which we now review.

Briefly as to the life background of the two defendants prior to events which immediately preceded the homicide:

The defendant Fernandez was thirty-four years old at the time of the trial. Born in Hawaii of Spanish parents he was brought as a child to the United States where he lived until 1932 when he was taken by his mother to Spain and there was married at the age of seventeen. Four children have since been born of that marriage to a wife who still resides in Spain. After working on lands owned by his father in Spain and later being engaged in combat service in the Spanish revolution, Fernandez returned in 1946 to the United States without his family. While employed with a construction company in Brooklyn he joined a "Lonely Hearts Club" by which he was put in touch by correspondence with numerous women, one being the defendant Beck, whom he met personally in December, 1947, at her home in Florida.

The defendant Martha Jule Beck—twenty-nine years old at the time of the trial—was born in Florida where during the years of her high school education she demonstrated more than average proficiency and had become the librarian of a women's club. Later, after graduating from the Pensacola School of Nursing, she became a registered nurse in which capacity she rendered service in Florida and subsequently held responsible positions in hospitals in California and Arizona. In the mean-

time, during her girlhood and later, she had been the victim of a number of sexual experiences one of which was productive of her first child born out of wedlock in September, 1944. Three months later she married Alfred Beck, who was not the father of her child, and who, unbeknown to her, had been married and was then the father of four children. After learning of his prior marriage she left Beck and in December, 1945, gave birth to her second child of whom Beck was the father. Thereafter, in March, 1947, she was divorced from Beck.

As already noted, Mrs. Beck first met the defendant Fernandez in Florida in December, 1947, as a result of communications which had come to her through a correspondence club. Thereafter Mrs. Beck came to New York City where, except for brief periods, she lived with Fernandez until December 17, 1948, when they rented an apartment in a house at 15 Adeline Place, Valley Stream, Nassau County.

During those months of 1948 while they were living together Fernandez, with the knowledge of Mrs. Beck, maintained his correspondence with women whose names he procured from Lonely Hearts Clubs and similar correspondence organizations. In fact he met and married two of those women and he visited others.

On December 26, 1948, the Lonely Hearts Club correspondence—which Fernandez conducted under the name of "Charles Martin"—was rewarded by a letter from Albany, New York, written by Mrs. Janet J. Fay in reply to a letter from Fernandez in which he had given a description of himself and had invited further communication with her. In her answer Mrs. Fay in turn not only gave a description of herself—a widow, forty-one years old, attractive, height five feet four inches, weight 135 pounds, whose hobby was dancing—but also invited Fernandez to come to Albany.*

In response to Mrs. Fay's invitation to Fernandez, he and Mrs. Beck on December 29, 1948, drove to Albany where he went alone to Mrs. Fay's apartment and there introduced himself as "Charles Martin." Several days later he took Mrs. Beck to call upon Mrs. Fay at which time he introduced Mrs. Beck as his sister. During those days at Albany Fernandez and Mrs. Fay met frequently at some of which meetings Mrs. Beck was

---

* There is evidence that Mrs. Fay's age was sixty-one or sixty-six years.

present when there were demonstrations of something more than a platonic interest by Mrs. Fay for Fernandez. Those visits also were productive of conversation which at times was directed to financial matters with the result that on Monday, January 3, 1949, Mrs. Fay and Fernandez went to various Albany banks from which she drew out funds in the form of cash and cashier's checks which in total amount exceeded $4,000, all of which she turned over to Fernandez. On that same day the defendants drove Mrs. Fay from Albany to their recently rented apartment at 15 Adeline Place in Valley Stream, Nassau County.

When they entered the apartment Fernandez noticed a number of pictures which previously had been hung in the living room had fallen to the floor. He then found a hammer with which he nailed the pictures back to the wall and placed the hammer on a chair in that room. Later, while Mrs. Beck was in the kitchen arranging for dinner Mrs. Fay and Fernandez prepared letters to be sent to Mrs. Fay's friends in Albany. These preparations were accomplished by writing diagonally across each letter sheet in large characters the word "Surprise" under which Mrs. Fay inscribed her signature. As to those single-worded notes signed by Mrs. Fay the fact should be noted at this point that, according to undisputed testimony by Fernandez, within two days thereafter—on a date *following* the homicide—the word "Surprise" appearing on each sheet was eradicated by the defendants and over Mrs. Fay's signatures were typewritten several notes to her Albany friends telling how happy and contented she was with "Charles". In one of those post-mortem notes which bore the signature of Mrs. Fay, the writer—the defendant Fernandez—inserted the following statements among others: " * * * I am all excited and having the most wonderful time of my life. I never felt as happy before. I soon will be Mrs. Martin and then we will go to Florida for the winter. * * * I am so happy and contented for Charles is so good and nice to me and also his family. They have done everything to make me feel comfortable and at home. * * * I really do miss you all but, I am sure that my prayers have been granted to me by sending this wonderful man to me. - - - God bless you all."

While Mrs. Fay was signing the sheets of paper upon which the single word " Surprise " was written, she also complied with a request by Fernandez that she indorse the checks on Albany banks which she had previously delivered to him.

We are thus brought to the several versions of the homicide given by the two defendants. There were received in evidence as part of the People's case—over objections presently to be considered—statements by the defendants in the nature of confessions made in Grand Rapids, Michigan, where the defendants were apprehended. We postpone consideration of those statements and give those versions most favorable to the defendants as recorded by their testimony when called as witnesses in their own defense. First the description of the killing and related incidents according to testimony by the defendant Fernandez: As there was only one bedroom available at the defendants' apartment the sleeping arrangements made for Mrs. Fay on the night of January 3, 1949, called for her occupying with Mrs. Beck a double bed in the bedroom and for Fernandez to sleep on a couch in the living room. Passing over his description of what occurred as the three made ready for the night, Fernandez testified that there came a time between 3:00 and 4:00 A.M. of January 4, 1949, when he was awakened by Mrs. Fay who had entered the living room and was kneeling at the side of his couch. Being unable to persuade her to leave the living room he went into the bedroom where he asked the defendant Beck to do what she could to "quiet Mrs. Fay and put her to bed." When Mrs. Beck left her bed and was about to enter the living room Fernandez, after telling her that he would go into the bathroom, stated "I told her as soon as I heard both women go back to bed I would leave the bathroom and go to sleep again." After remaining in the bathroom for a period of five or ten minutes— during which time he heard "murmurs of somebody speaking" but could not "distinguish anything"—Fernandez entered the living room where he found Mrs. Beck standing erect and Mrs. Fay crouched over a suitcase. His testimony as to what he then saw and did is as follows:

"I saw her head [Mrs. Fay's] was all splattered with blood. The suitcase was full of blood. On the floor was a great big puddle of blood. And as I saw that—I mean I stopped at the door. I saw that from view [sic] as I walked in. I rushed over

to Mrs. Beck. She was standing straight just looking down at Mrs. Fay and no movement, she didn't say a word.

"I shook her and I said: 'Mrs. Beck—' I said: 'Martha, what has happened?' She come out of something like a daze—I don't know if it was a daze or coma, whatever it was, and she looked down and she says: 'My God!' She says: 'What has happened?'

"I said: 'You ought to know better than I do.' I told her right there if she could do something, take her to a hospital or a doctor, drive her down. She got on her knees and took her pulse, or whatever it was, I don't know, and told me, she said: 'It's too late. There is nothing we can do for her. She is dead.'"

Fernandez testified further that when Mrs. Beck told him that Mrs. Fay was dead he "went into a hysteric", drank liquor from bottles which were near at hand and began to cry; that while he was in that condition Mrs. Beck came over to him and said: "'Well, there is no use getting that way. There is nothing we can do.'" Then, according to his testimony, "we decided of [sic] getting rid of the body." It is his testimony that he heard no "sound or moan or groan from Mrs. Fay"; that he did not strangle her, although he admits having put a scarf around her neck to stop the blood which was "gushing out of her head and to stop that bleeding so it wouldn't get all over the place in handling her". The defendants then tried to put the body of Mrs. Fay into a trunk which proved too small for that purpose. Lacking a trunk of sufficient size they put the body in a closet and a few hours later drove "down town" where they first made an unsuccessful attempt at a Wall Street bank to cash a $2,000 check given to Fernandez the night before by Mrs. Fay and later purchased a trunk large enough to accommodate her body.

During the ten days following the death of Mrs. Fay the defendants searched for a house which "had a yard or garage or cellar or something where I [Fernandez] can dig a hole in the ground and put her body." After trips to Bridgeport and other communities along U. S. Route No. 1 they found a house at South Ozone Park which met their requirements. Meanwhile the large trunk containing Mrs. Fay's body remained in the defendants' Adeline Place apartment for three days and was then removed by them to the home of a sister of Fernandez where he knew he would find a spade and shovel. About ten days after

the homicide he put those tools and the trunk into his car and drove the load to the house he had recently rented in South Ozone Park. There in the cellar he broke through the cement flooring and beneath it dug a hole into which he lowered the body of Mrs. Fay. He then covered the earthen refill with cement and left the place. There is testimony that after the homicide—which Fernandez referred to as "the occurrence of Mrs. Janet Fay"—he and Mrs. Beck planned to go to Alaska. In line with that plan they drove on January 20, 1949, to Chicago where they stayed for a few days and then motored to Grand Rapids, Michigan. There—on the night of February 28, 1949— at the home of Mrs. Delphine Downing at 3435 Byron Center Road where they had rented accommodations, they were taken into custody by detectives from the local department of police.

The testimony given upon the trial by the defendant Fernandez does not differ in important details from that given by Mrs. Beck, except her account of the death of Mrs. Fay, which in substance was as follows: The time is about 11:00 P.M. on January 3, 1949, after Mrs. Fay had been driven by Mrs. Beck and Fernandez from Albany to the defendants' Valley Stream apartment. They had spent the evening there and Fernandez had suggested that it was time to prepare for the night. At midnight they were all asleep—after each of the two women had sauntered back and forth several times from their bedroom to the living room where Fernandez was to sleep. A few hours later, however, Mrs. Fay awoke and started a conversation which annoyed Mrs. Beck. In those circumstances Mrs. Fay, under a pretext of going to the kitchen for a drink of water, went instead into the living room. In a brief time—between 3:30 and 4:00 A.M. of January 4, 1949—Fernandez came into the bedroom where he complained of Mrs. Fay's conduct and stated: " 'I am going in the bathroom and you go and talk to her and bring her back to bed.' " Responding to that request Mrs. Beck entered the living room where she observed Mrs. Fay lying on the couch. As to what then occurred Mrs. Beck testified as follows:

"Q. And how was she [Mrs. Fay] dressed? A. She was completely nude.

Q. Was she alive then? A. She most certainly was.

Q. What did you say when you entered that room? A. When I walked to the door there and I looked in and I saw her in that position and in the nude, I says, 'My gosh, Janet, what do you think you're doing?'

She jumped up. She picked up her gown that was lying on the floor in front of the couch and she slipped that over her head and put the robe on and she says: 'I wasn't expecting you.'

Q. What did you say to her then? A. I said: 'I can see that by your appearance, that you certainly wasn't.' I said: 'What do you think you're doing?'

She says, 'Well, I was expecting Ray to come in the door.'

And I said, 'For a woman of your age, you're the hottest bitch that I have ever seen.' * * *

Q. What made you say that? A. I was just burning up with jealousy and anger at the thought of what she was attempting to do.

Q. Now, what did she say when you said that to her? A. When I said that, she rushed over towards me and drew back her fist and slapped me. At the same time she slapped me she said: 'Are you being paid to make that remark?'

Q. Did she say anything about putting you out of the house? * * * A. When she made that remark and slapped me, I don't know what happened.

Q. You just said you don't know what happened after she made that remark and slapped you? A. That is correct.

Q. What is the next thing you recall? A. The next thing I know, Raymond had me by the shoulder.

Q. That is, Fernandez? A. The defendant Fernandez had me by the shoulders and was shaking me.

Q. How long a period of time intervened between the time that you recall the deceased Fay slapping you and the defendant Fernandez shaking you? A. I have no idea whatsover how long it was.

Q. When you were speaking with Mrs. Fay when this incident took place, was the defendant Fernandez in that living room? A. No, sir.

Q. Or in the hallway? A. The last time I saw Mr. Fernandez he was going into the bathroom and shut the door.

Q. To your knowledge or your impression, he was in the bathroom, is that correct. * * * A. That is correct. * * *

Q. Where was Mrs. Fay or her person when you first saw her after you realized that Fernandez was shaking you by the shoulders? A. After he was shaking me, the next time I saw Mrs. Fay she was slumped over a suitcase at my feet.

Q. Did you observe her physical condition? A. At that time everything was all blurred, your Honor.

Q. Did you observe her physical condition? You say you saw her slumped over your suitcase. * * *

Q. Please answer my question now. Did you observe her physical condition? A. She was lying there motionless.

Q. Motionless. Did you observe any appearance of blood? A. Your Honor, I took in everything at once. There appeared to be blood all over the floor, all surrounding her, and everything. * * *

Q. Getting back, Mrs. Beck, to the time that the defendant Fernandez came back into the living room, you say you recall him shaking you? A. That is correct.

Q. Now, did he say anything to you at that time? A. The first that I remember Mr. Fernandez saying to me, he was still shaking me, he said: 'My God, Martha, what have you done?'

Q. What did you do then? A. I said: 'What do you mean, what have I done?' And I looked at him and he was looking down towards the floor. That is when I turned my eyes from his face to the floor and that is when I saw the deceased Mrs. Fay.

I said: 'My God, what happened?'

He said: 'You should know better than I do.'

He says: 'Go downstairs; call a doctor, call an ambulance, call the police or do something.'

And I dropped to my knees beside her body and I took her pulse—I mean her wrist in my hand and tried to get her pulse. At the same time I used my other hand and I slipped it under her body and tried to get her heart beat. I could not discover a heart beat, respiration or pulse.

Q. To your knowledge was she dead at that moment? A. She was dead.''

The foregoing testimony given by the defendants on the trial makes clear their claim that the death of Mrs. Fay occurred after she sustained blows on the head from an instrument which penetrated her skull but before a scarf had been bound around her neck. In that important aspect the defendants' testimony at the trial differs from their previous confessions—given to Michigan authorities after their apprehension in that State— which confessions were received in evidence as a part of the People's case.

In her confession of March 3, 1949, Mrs. Beck stated in substance that at that early morning hour of January 4, 1949, while she and Mrs. Fay were engaged in the angry conversation which took place in the living room where Fernandez had been sleeping, Mrs. Fay said to her that after she and Fernandez were married Mrs. Beck would have to move out. Upon hearing that statement Mrs. Beck picked up the hammer which was in a chair near at hand and struck Mrs. Fay on the "back of the head." When Mrs. Fay, still moaning, dropped down from the kneeling position in which she had been, "I [Mrs. Beck] said Ray, and I hit her again." While Mrs. Fay was still moaning and groaning, bleeding "terribly", and after Fernandez had taken her by the throat with his "bare hands" in an attempt "to keep her quiet", and she "continued to moan" Mrs. Beck reached for a scarf and placed it around Mrs. Fay's neck. Fernandez then tied it in a knot and after putting the end of the hammer through the scarf, he used it as a tourniquet and "kept twisting it." When Mrs. Beck was asked "What did you think he was doing?" her answer was: "To keep her quiet as she was groaning. Q. Did you realize what you were doing? A. Certainly, we both realized then we had gone so far that we would have to— Q. Kill her? A. Yes. Q. When you did that did she stop moaning? A. Yes, that is when we laid her out on her back here, approximately the center of the room between two chairs. Q. Then what did you do? A. I straightened up and said, oh, my God, darling, what have we done."

Eight days after Mrs. Beck made the confession mentioned above and after conferring with her counsel appointed by the Michigan court, she was granted at her own request an opportunity to correct that part of her statement which referred to the use made of a hammer at the time of Mrs. Fay's death. After

describing motions made to her at that time by Fernandez, which indicated that he wanted her to get a hammer which was in the kitchen, Mrs. Beck stated: "* * * Ray [Fernandez] motioned to the kitchen and did like that and I took it for granted that he motioned for me to go and get the hammer which I did and brought it back. I had on a housecoat and I held the hammer in my sleeve next to my arm. Then I went in and held it out to Ray and he said no, you have got to do it. I said I can't. We were saying it very low because she was talking then as to getting out of the house. He said you have got to do it and I said I can't. He said if you love me you will do it. That is when I hit her."

A confession by Fernandez was also given to Michigan authorities on March 3, 1949. The portion of that confession which describes the death of Mrs. Fay in the early morning of January 4, 1949, is as follows: Fernandez has described how he left Mrs. Fay in the living room and had gone into the bedroom where he complained to Mrs. Beck that Mrs. Fay had interrupted his sleep at that early morning hour:

"Q. Did you say anything to Martha [Mrs. Beck]? A. Yes, I did. I said see how you can keep that woman quiet, no matter how it is and when I got back she had kept her quiet by hitting her on the head with a hammer.

Q. Where was the body at that time? A. Right here.

Q. Indicating where the suitcase was. Was she lying down? A. Flat on the floor and she was bleeding. I could hear blood dripping and she was moaning at that time. She dropped down and Martha was there and she called me and I came running and turned around and that bottle of whiskey was there and I drank it all.

Q. Wasn't that after? A. No. Then I came back and I helped her. She said to finish it.

Q. Where was the white scarf then? A. It must have been on my clothes, on the chair.

Q. Did Martha hand you that scarf? A. Yes.

Q. Where was the scarf when you came in? A. Don't remember exactly.

Q. Did Martha have the scarf or was it still on the chair when you came in? A. I am not sure. I knew I put it around her neck.

Q. How did you tie it? A. We turned it around.

Q. With what? A. Now, I got it. That question has been jumping at me hundreds of times. It was the hammer.

Q. The hammer? A. Yes, it was twisted with the hammer. Now I know. She had it tied on already, the scarf, and I put it in between the scarf and twisted it.

Q. Was that hammer already in there at that time when you came in the living room or did you put the hammer back. A. Don't know.

Q. Did you insert the hammer into the scarf? A. Yes.

Q. And you turned it just as you would a tourniquet? Turning it around, tightening it around the throat? A. Yes.

Q. Have you any idea how many times you turned that? A. Used a lot of strength to do it.

Q. Did she finally stop moaning? A. Don't know when she stopped. Went out and left again and came back in a few minutes.''

The inconsistancies between defendants' confessions and their testimony given at the trial, quoted in part above, presented for the triers of the facts the important question whether the death of Mrs. Fay occurred before or after Fernandez applied to her neck his bare hands and a tourniquet. On that phase of the case witnesses were produced by both the prosecution and the defense. The prosecution called the assistant medical examiner of Queens County who performed an autopsy upon the body of Mrs. Fay after it was exhumed from beneath the cellar floor of the South Ozone Park house. In the course of that autopsy the medical examiner removed a scarf which had been knotted tightly around the victim's neck. The autopsy disclosed two head wounds, one over the right side at about the midline and the other slightly to the back of the head. The shape of one wound was rectangular and the other triangular, each of which wounds broke through the scalp, the bone of the skull and entered the cranial cavity. There was also disclosed a fracture of the larynx or windpipe. Based upon his findings at the autopsy and upon his experience and his judgment gained therefrom, the medical examiner stated his opinion to be that the fracture of the larynx occurred before the victim's death; that, although either the skull fractures or the fractured larynx would eventually have caused death, a person who had sustained

such skull fractures would live for some time—"a matter of minutes or might be hours"—while the fracture of the larynx would cause the death within "a few minutes at the very uppermost". On cross-examination counsel for the defendants adduced from the medical examiner the statement that in his opinion Mrs. Fay met her death within three minutes after the alleged strangulation. Upon this same question—whether the death of Mrs. Fay occurred before or after strangulation—the defendants called as their witness a physician who had been chief medical examiner of Nassau County for more than ten years and who was present at the autopsy performed upon the body of the decedent. In response to questions addressed to him on direct examination this witness for the defendants stated that in his opinion Mrs. Fay's death was not caused by fractures of the skull but by strangulation.

A ruling which both defendants now assert constituted reversible error was made during the impanelment of the jury. The selection of the jury was from three panels totaling more than six hundred veniremen and was accomplished in twelve court days. When that impanelment was completed declarations had been made in behalf of the People and the two defendants that each juror was satisfactory. In the meantime, however, counsel for the defendants, by appropriate objections, motions for mistrial and exceptions, had preserved the point now made in their behalf.

The argument is that error prejudicial to the defendants' rights resulted from rulings by the Trial Justice on the *voir dire* examination when thirty-two challenges for cause made by the District Attorney were sustained upon the ground that the veniremen so challenged had indicated, by voice or upraised hand, in response to inquiry by the court or by the District Attorney, that they were opposed to capital punishment. The following excerpt from the record—covering an instance favorable to the defendants' position—will make clear the circumstances in which this point arose:

"By Mr. Robinson [the assistant district attorney]:

Q. Madam and you gentlemen that have just been called, I think you have sat here and listened to all the names and so forth. Are any of you opposed to capital punishment?

A. (Talesmen Keck, Manghise and Cooperman raise their hands.)

Mr. Robinson: Three. I challenge you all.

Mr. Rosenberg [counsel for defendants]: If your Honor please, may I be permitted to question these jurors concerning their principles?

The Court: No. When the jurors state they are opposed to capital punishment, the jurors are legally disqualified from sitting in a case of this character.

Mr. Rosenberg: May I state the reasons why I want to question the jurors?

The Court: No; because it is not necessary. The mere statement by the three talesmen, that they are opposed to capital punishment, is sufficient.

Mr. Rosenberg: They still may have no conscientious scruples from rendering the death verdict.

The Court: No.

Mr. Rosenberg: I take an exception to your Honor's refusal to permit me to examine these jurors. My exception is noted to your Honor's ruling.''

The grounds for challenge of a venireman for implied bias are set forth in section 377 of the Code of Criminal Procedure which provides in part:

''§ 377. *Grounds of challenge for implied bias.* A challenge for implied bias may be taken for all or any of the following causes, and for no other: * * *

''8. If the crime charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he shall neither be permitted nor compelled to serve as a juror.''

Under that statute the court is required in a capital case to exclude from the jury any venireman who may, on the *voir dire* examination, indicate that he has such conscientious opinions as would preclude him from returning a verdict of guilty. That section, however, does not require the court to permit service on the jury of veniremen who state that their conscientious opinions will not prevent them from returning a verdict of guilty. In such circumstances the court may exercise the statutory discretion with which it is endowed by section 376 *id.* That statute provides in part:

"§ 376. *Particular causes of challenge.* Particular causes of challenge are of two kinds:

"1. For such a bias, as, when the existence of the facts is ascertained, does in judgment of law disqualify the juror, and which is known in this Code as implied bias:

"2. For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, *which satisfies the court, in the exercise of a sound discretion,* that such juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, and which is known in this Code as actual bias." (Emphasis supplied.)

It is thus seen that, although in a capital case the court is not required as a matter of law under section 377 (*supra*) to exclude from the jury a venireman who states that his conscientious scruples would not prevent him from returning a verdict of guilty, nevertheless subdivision 2 of section 376 (*supra*) empowers the court in the exercise of the discretion thereby granted to excuse from the jury any venireman who, in the opinion of the court, cannot try the issues impartially.

Here, among the thirty-two challenges which were sustained, there were several prospective jurors who expressed their opposition to capital punishment and as to whom inquiry was denied whether their opposition to the death penalty would prevent them from returning against the defendants a verdict of guilty. Had the court permitted such inquiry it might well have been developed that their scruples were such that they would not be able to join in a verdict of defendants' guilt. In that event, as we have seen, they would as a matter of law be excused under section 377 *id.* However, if such inquiry had educed a negative answer to the question whether their scruples would prevent them from finding the defendants guilty, the court had the power—"in the exercise of a sound discretion", with which it was vested by section 376 *id.*—to excuse those jurors. Clearly, upon the *voir dire* examination, a declaration by a venireman that he is opposed to capital punishment—even though upon further inquiry he might state that he could find defendants guilty—is *some evidence* of his predisposition against the death penalty. We are thus led to conclude that such declaration afforded a sufficient basis for the ruling by the court—made in the exercise of its statutory discretion—which ruling, we may

assume, was in effect that such jurors could "not try the issue impartially and without prejudice to the substantial rights of the party challenging * * *." (Code Crim. Pro., § 376, subd. 2.)

We therefore do not regard as reversible errors those rulings by the Trial Justice upon the *voir dire* examination now challenged by the defendants. We add, however, as a counsel of caution, that it would have been better practice—in connection with those challenges by the People, where further examination was denied—for the court to have withheld its ruling and delayed the exercise of its statutory discretion until further examination of the prospective jurors thus challenged had indicated whether their opposition to the death penalty would prevent their impartial determination of the defendants' guilt.

Both defendants also challenge rulings by which there were received in evidence the confessions, referred to *supra,* made by them in Michigan. Before considering those challenges it should be made clear that the death of Mrs. Fay in New York on January 4, 1949, was not the reason which led to the defendants being taken into custody on February 28th in Michigan; nor was it, in the first instance, the reason why thereafter statements by the defendants were taken by local authorities in Michigan.

We have seen that after leaving New York and reaching Michigan en route to Alaska, the defendants had rented accommodations in or near Grand Rapids at No. 3435 Byron Center Road—that being the home of Mrs. Delphine Downing and her two-year-old daughter. While the defendants were occupying those quarters there came a time in the latter part of February, 1949, when police authorities of Kent County, Michigan, were apprised of the fact that Mrs. Downing and her child had disappeared. The search then begun brought local police to the Downing home on the night of February 28th when the defendants were questioned as to "the whereabouts of Mrs. Delphine Downing". After being questioned on that subject at the Downing home the police took them to the local jail where further questioning brought forth statements which not only implicated the defendants in the disappearance of Mrs. Downing but also implicated them in the death in New York of Mrs. Janet Fay and gave a clue as to where in Nassau County, New York, the body of Mrs. Fay could be found. That clue, when relayed

by news reporters in Michigan to news reporters in New York and thence to police officials of Queens and Nassau Counties, led to the exhumation of Mrs. Fay's body and set in motion in New York the police investigation which gave rise to the present criminal prosecution. As an incident to that investigation an assistant district attorney of Nassau County was sent on March 2, 1949, to Grand Rapids to investigate the source of the clue which had led to the discovery of Mrs. Fay's body. It thus came about that on March 3, 1949, the statements already made to Michigan authorities by the defendants had not only made their presence in Michigan of first importance to the criminal investigation then in progress in connection with the disappearance of Mrs. Downing, but also made the defendants suspect in connection with the death of Mrs. Fay in New York.

Although statements by the defendants made to Michigan authorities on March 1st and 2d were not received in evidence in the case now before us, we know, from testimony in the present case by Fernandez—called as a witness in his own behalf and previously instructed as to his right to refuse to answer any question which might incriminate him—that on the night of February 26, 1949, at Byron Center Road he had shot and killed Mrs. Delphine Downing and had buried her body beneath the cellar floor of the Downing house. Indeed the fact was brought into the record at hand by counsel for the defendants that, on March 2, 1949, in the County Court of Kent County, Michigan, Fernandez pleaded guilty to having shot and killed Mrs. Downing.

Against this background of facts explanatory of how it came about that the three confessions made by the defendants in Michigan were offered at the trial of the present action in New York, we reach a consideration of the admissibility of those three confessions, viz., a single confession by each defendant made in Michigan on March 3d to the assistant district attorney of Nassau County who had then arrived on the Michigan scene, and the subsequent corrective statement by the defendant Beck made at her own request on March 11th to the prosecuting attorney of Kent County in the presence of the assistant district attorney of Nassau County.

Before the receipt in evidence of those three confessions their admissibility under section 395 of the Code of Criminal Pro-

cedure was the subject of a searching preliminary examination which—by testimony covering more than seven hundred pages of the record from witnesses called by the prosecution and the defense—developed in detail the circumstances in which the defendants' statements were made.

The position taken by the defendants is that their confessions made in Michigan were involuntary and were made "under a promise of the District Attorney that the defendants would not be prosecuted here." In support of that position the defendants assert that when on March 1st and 2d they made statements to the Michigan authorities, they did so upon the promise by the prosecuting attorney of Kent County that their statements would not be used against them in another State. The defendants make the further assertion that the assistant district attorney of Nassau County was present in Grand Rapids on March 3d when Fernandez signed statements previously made by him to Michigan authorities; that on that occasion the Kent County prosecutor told him that he had been " 'appointed to represent New York' " and that the assistant district attorney of Nassau County said " 'That's right.' " There was also testimony by Fernandez that on the occasion last mentioned above, in the presence of the assistant district attorney of Nassau County, the Kent County prosecutor "promised me if I did sign those statements* that they would never be used outside the State of Michigan, the contents of the statements would not be used, and they would be put in his safe". In that connection Fernandez stated he refused to sign those statements until the prosecutor had given him that promise. In reference to the statement which Fernandez made to the assistant district attorney of Nassau County on March 3d, Fernandez testified that the assistant district attorney made to him a promise—"That whatever I said, the contents, would never be used against me, it was just merely to clear the case, close the case, and that was all."

Although Mrs. Beck was not called as a witness on the preliminary examination, she testified later in the trial that, prior to the statements she made to Michigan authorities on March 1st and 2d, the Kent County prosecutor had told her in sub-

---

* The reference is to statements, made by Fernandez on March 1st and 2d, which were not received in evidence in this case.

stance that whatever statement she made would not be used against her in another State.

Proceeding upon the assumption that their testimony, to which reference is made above, was true, the defendants contend that the alleged prior promise made to them by the Kent County prosecutor when they made their confessions to Michigan authorities on March 1st and 2d, was to them an inducement to confess with assurance that their statements would not be used against them in another State; that inasmuch as the assistant district attorney of Nassau County was present and remained silent on the occasion when that promise was made, the inducement and assurance then gained by them continued as such when later they made the confessions which were received in evidence in the case at bar.

No weight can be given to that argument when applied to the corrective statement made by Mrs. Beck on March 11th—which was done at her own request after she was advised as to her rights by the Michigan attorney assigned to her by the court—in which confession she stated she knew that it could be used against her in New York.

The truth of the defendants' testimony hereinbefore mentioned—which they now claim should have dictated the rejection of their confessions when offered by the prosecution as a part of the People's case—did not go unchallenged. Accordingly the testimony by the defendants on that phase of the case must be considered with the following testimony: The prosecuting attorney of Kent County when called as a witness by the *defendants* testified on *direct* examination that he was never authorized by the assistant district attorney of Nassau County or by anyone to represent the State of New York in the criminal investigation which was being conducted in Michigan and he denied that he had ever said to the defendants that he represented the State of New York in that investigation; he denied that he made any promise to either Fernandez or Mrs. Beck before they made their statements of March 1st and 2d. As to what occurred thereafter on March 3d, when Fernandez refused to sign his earlier confession, the Kent County prosecutor testified "I asked [Fernandez] if he would sign a copy for my files in Michigan; that that signed copy itself would not be turned over to New York. But prior to the signing I explained to him that New York had

unsigned copies, as did half the newspaper men that were there, and that I could be called as a witness to testify.'' The defendants also called as a witness the assistant district attorney of Nassau County who, as we have seen, had arrived at Grand Rapids during the evening of March 2d. As a witness for the defendants he denied that he had stated to Mrs. Beck that he would not prosecute her for any statement she made to him, or that, no matter what she said to him, it would not be used against her; he denied that the prosecuting attorney of Kent County was authorized by him or by the State of New York to promise her that nothing she might say would be used against her; he denied that he at any time authorized the Kent County prosecutor to represent the State of New York. In addition he testified that he ''made no promise of any kind to either defendant at any time'' and that he had no recollection of having heard the Kent County prosecutor say in Mrs. Beck's presence that he would always keep his promise to her. When asked on direct examination by counsel for the defendants to state what promise the Kent County prosecutor had made in his presence, the assistant district attorney answered as follows:

> ''A. He told Fernandez that the only reason he wanted the statement signed, the statement that he had there, was that he wanted it for his file in Michigan; and he told Fernandez that he would not give that signed statement to me or to any other authority.
>
> Q. Did he say the signed statement would not be used against him? A. As I remember it, he said he would not give that signed statement to me or to any New York authority. He went on to tell Mr. Fernandez at that time, after I had handed Mr. McMahon a note—he told Mr. Fernandez at that time that he could be subpoenaed to New York and that he would have to testify if subpoenaed. He also pointed out to Mr. Fernandez at that time that during the taking of the statements, the various newspapermen were there; that anyone of those newspapermen could be subpoenaed and would have to testify as to what they heard during the taking of the statement. He pointed that out to Mr. Fernandez, and Fernandez nodded his head and said he understood that; that what he was concerned with was the signed statement.''

At a later point in the direct examination of the assistant district attorney as a witness called by the defendants the following question and answer appears: "Q. Is it á fact, Mr. Robinson, that you said in the defendant Fernandez' presence that 'if Mr. McMahon made a promise, I will back Mr. McMahon and so will the State of New York and nothing you say will be used against you'? A. I never made any such statement at any time either in the presence of Fernandez or Mrs. Beck or any other one."

When, in the light of section 395 of the Code of Criminal Procedure, we view that large portion of the record which bears upon the question whether the defendants' confessions of March 3 and 11, 1949, were voluntary, or whether they were made as a result of a promise by the District Attorney that defendants would not be prosecuted in any State other than Michigan, we find no testimony which did more than present factual questions of credibility appropriate only for submission to the jury. The decision of those questions depended upon where lay the truth as between the testimony of the defendants and the testimony of the prosecuting attorney of Kent County, Michigan, and the assistant district attorney of Nassau County, New York. Had there been no conflict in the proof on the question of the voluntary quality of those confessions or as to whether a promise— such as those claimed by the defendants to have been made by the District Attorney—had in fact been made, the admission in evidence of those confessions would not have been a jury question. It is the obvious conflict in the testimony upon that subject—involving clear questions of credibility—which makes applicable the rule of our decisions that where such a conflict exists the confessions should be admitted in evidence and the question left to the jury whether they constituted voluntary statements by the defendants and were not brought about by circumstances proscribed by section 395 of the Code of Criminal Procedure.

We think the Trial Justice exercised care clearly commensurate with the importance of this phase of the case to the defendants' rights, and we regard as adequate that portion of this charge which deals with that problem. (*People* v. *Doran*, 246 N. Y. 409, 416-417; *People* v. *Trybus*, 219 N. Y. 18, 22; *People* v. *Randazzio*, 194 N. Y. 147, 156; *People* v. *Brasch*, 193 N. Y. 46, 57.)

On the question whether either of the defendants was so overborne by prolonged questioning or otherwise before the confessions here involved were made, the record falls far short of affording a basis for such a claim. We note that at the close of the confession by Fernandez made on March 3d, he stated that in the conduct of his examination by the assistant district attorney of Nassau County he (Fernandez) had been treated "perfectly" and that what he had stated was done voluntarily. Likewise at the close of Mrs. Beck's confessions on the same day she went so far as to state that the treatment accorded to her while her confession was given had been "wonderful" and that she had voluntarily made the statement contained therein.

A point advanced by counsel for the defendant Fernandez presents the argument that it was reversible error for the Trial Justice to assign as trial counsel for the defendant Fernandez the same attorney who had been retained by the defendant Beck, the assertion being that the interests of the two defendants were in such conflict as to deprive Fernandez of a trial conformable to the requirements of due process of law.

At the opening of the trial on June 6, 1949, when both defendants were present in court, the following colloquy took place:

" Mr. Rosenberg: The defendant Raymond M. Fernandez, if your Honor please, has a letter addressed to the Court, that I would like to present to your Honor (handing paper to the Court).

The Court: (after reading paper.) Mr. District Attorney, will you look at this letter?

Mr. Robinson: (after examining letter.) The People have no objection to the granting of the request.

The Court: Is there a similar application on behalf of the defendant Beck?

Mr. Rosenberg: No; no application in behalf of the defendant Beck. That is only in behalf of the defendant Fernandez.

The Court: Do you appear for the defendant Beck?

Mr. Rosenberg: Yes, sir.

The Court: Well, in view of this request made to the Court, this letter the Court has just received from the defendant Fernandez, I will assign you, Mr. Rosenberg, to

act as attorney for the defendant Fernandez throughout this trial.

Mr. Rosenberg: To comply with the Statute, may the record officially show that your Honor grants me permission to withdraw at this time as his attorney and then accept your assignment?

The Court: Very well. You may do so.

Mr. Rosenberg: And any statutory charges that counsel may be entitled to are a charge on the County of Nassau?

The Court: That need not concern you.''

The letter addressed by Fernandez to the Trial Justice, to which reference is made in the colloquy quoted above, reads as follows:

"June 6th 1949.

Dear Judge Pecora:

I am at present without funds of any kind and my friends & family can-not assist me in my defense. All my funds of several thousand Dollars & other valuable properties are attached in the State of Michigan where they were taken from me.

I am destitute and without the money now needed to defend my-self on the charge of Murder in the First Degree.

Would you please assign me council to protect my rights on and during my trial,—Mr. Rosenberg.

Mr. Rosenberg, my present Lawyer has done a great deal for me here and I am perfectly satisfied and would appreciate that he be assigned to be my Lawyer. He is fully familiar with my case and I have greatest of confidence in him. I would also like to be able to get a complete Copy of the Minutes of my trial.

RAYMOND M. FERNANDEZ ''.

Upon the argument of this appeal and in his brief counsel for Fernandez has made the statement that the designation of Mr. Rosenberg as counsel for Fernandez was done in a casual and perfunctory manner and without preliminary examination or inquiry to determine whether there might not well be conflicting interests between the two defendants, or other reasons why separate counsel should not be named. That comment is not borne out by the record of proceedings had at the trial after it had been in progress for more than three weeks.

At that time the Trial Justice had occasion to state to counsel for the defendants as follows: "Mr. Rosenberg, you were counsel for the defendants in this case prior to the 6th day of June, when the case first appeared before this Court for trial, on which day I assigned you, at the request of the defendant Fernandez, to defend him, which was a request that you also asked me to accede to. But I understand that for a substantial period of time, covering several weeks at least, you had been the legal adviser of these two defendants in connection with matters relating to this case, so that you knew what this case was about long before, or weeks before the trial opened on June 6th. * * * You were not injected into this case for the first time on June 6th, when this trial opened, you were connected with the two defendants in this case for weeks prior to that time." From the foregoing statements which stand uncontradicted on the record, and from statements contained in the last paragraph of the Fernandez letter of June 6th, quoted *supra,* which was before the Trial Justice, it is clear that the Justice was informed that Mr. Rosenberg, who up to that time had served as attorney for both defendants, had as much knowledge of each defendant's case as could reasonably be expected at that time. In fact it appears of record before us that on March 14th, the day before the defendants — following extradition proceedings — were brought from Michigan to New York and *twelve weeks* before the trial herein commenced in the city of New York, Mr. Rosenberg was present in Grand Rapids where he made an unsuccessful effort to appear for and represent Fernandez at a hearing in the Circuit Court of Kent County, Michigan, in a proceeding involving a writ of habeas corpus.

It may also be said that counsel's comment on this appeal in reference to "conflicting interests between the two defendants" reflects the benefit of hindsight employed from his vantage point taken long after the close of the trial.

Despite what was said at the opening of the trial in the colloquy quoted above—all in the presence of both defendants—and in spite of the written request by Fernandez for the assignment as his counsel of the attorney who had been retained by Mrs. Beck, we are now asked to hold that on the first day of the trial the presiding Justice should have refused to make the assignment requested by Fernandez. In the circumstances of

record, which we deem relevant to the problem, we prefer to give the Trial Justice the benefit of the presumption that he did his duty, not only because he is entitled to that presumption but also because the record shows that as the trial progressed the question was repeatedly brought to the attention of all concerned as to whether additional counsel should be assigned to assist Mr. Rosenberg who was representing both defendants. For example: On June 29, 1949, counsel for the defendant complained in open court that he did not have sufficient time to read the daily record of testimony which was being transcribed. The Trial Justice thereupon offered to assign additional counsel to aid him as attorney for the defendant Fernandez. In response to that offer Mr. Rosenberg stated he would consult Fernandez as to the court's offer and would report "tomorrow". On the next day the following occurred:

> "Mr. Rosenberg: If your Honor pleases, for the record may it be noted that both defendants are perfectly satisfied with counsel that is now representing them.
> The Court: All right.
> Mr. Rosenberg: There is no question about that. I think there was mention yesterday about counsel. They are both perfectly satisfied and they authorize me to further proceed.
> The Court: You see no reason for asking that counsel be assigned, other counsel, to assist you?
> Mr. Rosenberg: Not in the middle of this case.
> The Court: You know, I offered to do that.
> Mr. Rosenberg: Yes. As long as I am not unduly rushed I think I can continue."

Again at the close of the direct examination of Fernandez by his counsel the following question and answer appear: "Q. My last question to you, Mr. Fernandez. Do you feel now that you are properly represented by counsel? A. I certainly do."

Thereafter on July 28th, at the close of direct examination of Mrs. Beck by defendants' counsel the following appears: "Q. Are you at this time perfectly satisfied with the way I have represented you? A. Yes, sir."

We also regard as relevant to the point under consideration the following excerpts from the charge to the jury given by the Trial Justice: "* * * I feel certain that the People of the

State of New York were adequately represented upon this trial by Mr. Robinson, and by Mr. Huntington, another assistant district attorney of Nassau County who has assisted him.

"I feel equally certain that the defendants in this case have had the benefit of an *exceedingly zealous and industrious and capable service* rendered to them by their counsel, Mr. Rosenberg. * * *

"I am mindful of the labors and the difficulties and the responsibilities which entail upon counsel in a case, especially one of this character. I think I know something about the tribulations that sometimes attend the discharge of their important duties by lawyers engaged in the trial of a case; and if tempers became frayed and voices rose, I understand fully, and I hope you do, that it is an inevitable part of the trial of an important case. * * *

"As I have already indicated, counsel on both sides in this case have discharged their duties *with diligence, with industry, and with fidelity.*" (Emphasis supplied.)

True it is that there developed in this long trial instances where the interests of the two defendants being tried jointly were in conflict. In most of those instances, however, the Trial Justice gave definite instructions to the jury as to their duty in the consideration of that particular evidence.

When, at the conclusion of one of the longest and—from the standpoint of the presiding officer—one of the most difficult cases tried in recent years in the metropolitan area of this jurisdiction, the Trial Justice can say of the lawyer for both defendants what has been quoted *supra*—joining him with opposing counsel as having "* * * discharged their duties with diligence, with industry, and with fidelity"—we cannot say that the Trial Justice committed reversible error by his order, made in the exercise of his judicial discretion, by which he assigned as counsel for Fernandez the same attorney who had represented him up to that time and who had already been retained by Mrs. Beck.

The brief for Fernandez asserts that it was prejudicial error for the court to receive in evidence testimony given by the two psychiatrists called by the prosecution—Doctors Lichtenstein and McCartney—which testimony quoted statements by Mrs. Beck recounting some of the incidents of January 3 and 4, 1949.

In that connection it should be said at this point that although the plea of insanity as a defense interposed by Fernandez was withdrawn during the trial, a like defensive plea by Mrs. Beck was not withdrawn.

The two witnesses whose testimony in part is criticized are psychiatrists of note who were employed by the prosecution to inquire into the sanity of Mrs. Beck. At the request of the District Attorney Dr. Lichtenstein first visited Mrs. Beck at the prison at Mineola on March 15, 1949. Later he and Dr. McCartney went together to the prison where their examination, as described by Dr. Lichtenstein, was introduced by him by the following statement—which should be read with the fact in mind that Mrs. Beck is a registered trained nurse who studied psychiatry as a specialty. Dr. Lichtenstein testified: "Dr. McCartney and I visited the prison together, and I said to her— I said, 'Now, my name is Dr. Lichtenstein and this is Dr. McCartney. We are psychiatrists. *We were sent here by the district attorney of the County of Nassau. We were asked to make an examination of you. You need not say one word if you don't want to speak to us. That is your right. We may be called to testify in your case. If you decide to speak to us, if you decide to tell us about this crime, I trust that you will tell us the truth. Are you willing to speak to us?' And she said yes.* Now at that time we asked the matron to leave, and there were two doctors, Dr. McCartney and I, and the nurse; and I spoke to her, and she said the following concerning the crime * * *." (Emphasis supplied.)

Dr. Lichtenstein then recounted Mrs. Beck's statement of occurrences not only of January 3 and 4, 1949, but she also told them of sexual experiences which had occurred during the early years of her life. Then follows the long hypothetical question as to whether Mrs. Beck, at the time of the killing of Mrs. Fay, knew the nature and quality of her act. To that question the witness gave it as his opinion that at the time of the killing Mrs. Beck "* * * knew the nature and the quality of the act and that she knew that the act was wrong." His reasons are given in full. Dr. Lichtenstein also testified that in his opinion Mrs. Beck, at the time of the killing suffered no amnesia and stated his reasons for that opinion.

Dr. McCartney, upon the same questions, testified that in his opinion Mrs. Beck at the time of the killing "* * * knew what

she was doing; she knew the nature and quality of her act, and she knew that it was wrong.'' His further opinion was that Mrs. Beck suffered from no amnesia at the time of the killing.

It should be said that after Doctors Lichtenstein and McCartney left the stand Mrs. Beck was recalled and denied that when they examined her she was advised of her rights.

The criticism now made in behalf of Fernandez of the ruling which permitted in evidence the testimony of the two psychiatrists called by the prosecution is that such ruling was contrary to public policy and contrary to that inherent fairness which is desirable in the administration of criminal law. Had the prosecution's two psychiatrists failed to warn Mrs. Beck there might have been a firmer basis for that criticism. We believe, however, that the warning given to her—if believed by the jury, as apparently it was believed—removes any disregard of public policy and any lack of fairness as bases for the criticism now leveled at the prosecution. In the circumstances disclosed by the record we do not regard the criticism by the defendant Fernandez so well founded as to prompt our reversal of the judgments of conviction herein.

In addition to the points and arguments made in behalf of the defendants, to which reference has already been made, we have considered with care all other matters to which the briefs of counsel direct our attention. Our conclusion is that the record contains no errors which so adversely affected the substantial rights of the defendants as to warrant reversal of the judgments herein and a new trial.

Accordingly, as to each defendant, the judgment of conviction should be affirmed.

DESMOND, J. (concurring). I concur with Judge LEWIS for affirmance, and I agree with practically all of his able and comprehensive opinion. However, as to two matters I wish to express my separate views.

First, as to the representation of both defendants by the same trial counsel, I do not see how the Trial Justice could have done other than he did. Long before the trial, these defendants retained this attorney to act for both of them. He had been active in trial preparation and preliminary proceedings for months before the trial. Just before the trial, apparently to save expense, defendant Fernandez asked the court to assign

as his attorney, this same lawyer, and surely there was then no reason for the court to deny that request. When, during the trial, certain conflicts, or seeming conflicts in interest appeared, the court was careful to inquire as to whether both defendants still desired that this joint representation by the same attorney continue. They assured the Judge that they did. These defendants were shrewd, intelligent people, who knew what they wanted. If the time-honored rule — that a defendant has the right to be represented by counsel of his own choice — means what it says (see *People* v. *Rocco,* 209 Cal. 68, 73), then there was nothing for the court to do about it, and no error in doing nothing further about it.

Second, as to the refusal of the court to permit cross-examination of some of the talesmen who said they were opposed to capital punishment, and as to the court's allowance of the challenges directed against those talesmen: This, I am bound to say, was plain error, under section 382 of the Code of Criminal Procedure. However, it did not deprive defendants of their right to trial by a fair and impartial jury. Under the controlling authorities, such an error prejudiced no substantial rights of defendants (*People* v. *Prior,* 294 N. Y. 405, 411, 412, and cases cited), and so it is no basis for a reversal (Code Crim. Pro., § 542).

I vote to affirm as to each defendant.

Conway, J. (dissenting). On January 4, 1949, Mrs. Janet J. Fay was killed in the town of Hempstead, Long Island. The two codefendants, Raymond Fernandez and Martha Jule Beck, stand convicted of her murder, on an indictment which charged that each of them " then and there aiding and abetting the other, wilfully, feloniously, and of malice aforethought, killed one Janet J. Fay by then and there striking [her] with a hammer, and * * * strangling [her] with a * * * scarf * * *."

There was a definite conflict of interest between the defendants. Fernandez maintained that he had had no hand in the slaying of Mrs. Fay no matter what he may have done after she had been struck down with a hammer while she and Mrs. Beck were alone together. In his testimony at the trial he stated that on the night of the homicide Mrs. Fay and Mrs. Beck occupied a double bed in the bedroom, while he slept on a couch in the living room of

the apartment. He said that there came a time between three and four o'clock in the morning of January 4, 1949, when he was awakened by Mrs. Fay, the deceased, who was kneeling at the side of his couch. Being unable to persuade her to return to her bed, he went into the bedroom and asked Mrs. Beck to try to persuade Mrs. Fay to return there. When Mrs. Beck proceeded toward the living room, Fernandez went into the bathroom. Before going however, he testified: " I told her [Mrs. Beck] as soon as I heard both women go back to bed I would leave the bathroom and go to sleep again." After remaining in the bathroom for a period of from five to ten minutes, he returned to the living room where he found Mrs. Fay crouched over a suitcase, bleeding profusely, with Mrs. Beck standing near her, motionless. He said that he shook Mrs. Beck and upon coming " out of something like a daze " she exclaimed " What has happened? ". He then said: " You ought to know better than I do." He testified that Mrs. Beck (a registered nurse in Florida) then took Mrs. Fay's pulse and informed him that she was dead. They then decided to dispose of the body. Fernandez said he did not strangle Mrs. Fay although he did put a scarf around her neck to stop the bleeding so " it wouldn't get all over the place in handling her". He attempted to explain his confession of participation by testifying that he made it to shield Mrs. Beck with whom he was in love. That testimony, if accredited, made Fernandez no more than an accessory after the fact, a crime punishable by imprisonment for not more than five years. (Penal Law § 1934.)

In his charge at the close of the trial, the learned Justice outlined in detail the claims of the prosecution and the evidence adduced in support of them, but failed to make reference to this defense of Fernandez or to charge the law applicable thereto. One of the primary purposes of a charge is to aid the jury in deciding the material issues in a case. It is to point out the relevant, material and vital facts, among a great number before them, which bear upon the issues of guilt or innocence. This court in referring to a Trial Judge's charge in *People* v. *Fanning* (131 N. Y. 659, 663) said: " ' In a criminal case we think the judge has the right, and indeed it is his duty to present the evidence to the jury in such light and with such comments that the jury may see its relevancy and pertinency to the particular issue

upon which it was admitted, and thus be better qualified to appreciate its character and weight and to determine its credibility. These questions are for the jury, but it is proper that a judge should assist the jury in marshalling the evidence so that they may the more readily and intelligently come to a conclusion which shall be satisfactory to themselves, consistent with the evidence and in accordance with the law. The judge should do this in a fair and impartial manner, having due regard to the' rights of the defendant and with a serious and anxious desire for their preservation' ''.

While the charge took some hours due to the length of the trial, the court failed to make reference to the one issue in the case raised by the defendant Fernandez which, if believed, would have led to his acquittal of the capital offense charged, although it might well have led to his conviction of a lesser crime. An omission such as that in a capital case has been held to be error (see *People* v. *Odell,* 230 N. Y. 481, 488; *People* v. *Becker,* 210 N. Y. 274, 308; *People* v. *Montesanto,* 236 N. Y. 396) necessitating the ordering of a new trial. Here Fernandez was entitled at the very least, to a charge that if he were an accessory after the fact, he could not be found guilty of murder or manslaughter in any degree. The jury was not so charged and it is difficult to see how, when it deliberated, the jury could have given proper consideration to the facts presented by Fernandez in his defense without having been told the law with which to guide themselves, or that Fernandez might be convicted of the felony of being an accessory after the fact.

Of course, in the average case, where a defendant is represented by counsel alert only to his interest, an omission to charge upon the only defense put forward would be cured promptly by the request of his counsel for a proper and adequate charge with reference to that defense. Here that was not done and that brings us to a second and further reason why there must be a new trial here. There was a sharp conflict of interest between the two defendants and yet they were represented by the same counsel. So clear was that conflict that this court declined to assign for Fernandez on the appeal to us, the counsel who had represented him at the trial and who there also represented Mrs. Beck. (*People* v. *Fernandez,* 300 N. Y. 646.) The sharpness of the conflict is made evident by the defense of Fernandez to which

we have referred. If that defense were true and was credited by the jury, Mrs. Beck and Mrs. Beck alone was guilty of the murder of Mrs. Fay. To request a charge of the Trial Justice that if the jury believed that defense, Fernandez was not guilty of murder but was only an accessory after the fact, would have been to stress and to emphasize that Mrs. Beck was solely guilty. No such request was made by counsel assigned for Fernandez.

At the opening of the trial, counsel theretofore retained by Mrs. Beck and Fernandez presented to the court a letter from the latter stating that he was destitute and asking the court to assign to defend him the same counsel who had been originally retained by both of them. The court thereupon asked the District Attorney, the public official familiar with the case, to look at the letter. The assistant district attorney after examining it said that the People had no objection to the granting of the request. While the court was not then advised by the assistant district attorney that there was any such conflict of interest as to render it improper to *assign* the same counsel for Fernandez as was still under *retainer* by Mrs. Beck, the court was put upon notice of it five days after the commencement of the trial, which lasted for ten weeks, by the counsel for the two defendants. On that day defense counsel asserted that he did not have sufficient time to go over the confessions (plural) which had just been introduced, marked for identification and made available to him. He asked for the assignment of " more counsel " and later for the assignment of associate counsel. It was during that colloquy that the attention of the court was called by defense counsel to the duty of the court to protect the interests of the defendants:

" [Counsel]: Judge, if I undertook something that was too great for me, you are now the presiding judge, you have a duty to protect the rights of these defendants.

" The Court: And I am doing everything that the law warrants me doing to protect the legal rights of these defendants.

" [Counsel]: And if I bit off more—".

Immediately thereafter, the jury having been excused, a discussion took place in which the Trial Judge offered to assign additional counsel but was informed by the counsel for the defendants that he would consult with Fernandez as to the court's offer and would let the court know the result of the conference on the following day. On the day following this occurred:

" [Counsel] : If your Honor pleases, for the record may it be noted that both defendants are perfectly satisfied with counsel that is now representing them.

" The Court: All right.

" [Counsel] : There is no question about that. I think there was mention yesterday about counsel. They are both perfectly. satisfied and they authorize me to further proceed. ·

" The Court: You see no reason for asking that counsel be assigned, other counsel, to assist you?

" [Counsel] : Not in the middle of this case.

" The Court: You know, I offered to do that.

" [Counsel] : Yes. As long as I am not unduly rushed I think I can continue."

At the time of that colloquy, it had already become apparent that there had been confessions made by each of the defendants implicating the other and that it was impossible for one lawyer properly to defend both. In addition, at that time, both defend-- ants were being defended by counsel under a plea of not guilty with a specification of insanity thereunder. Some weeks later Fernandez withdrew the specification, his counsel stating that the withdrawal was at " his [Fernandez] specific request." There was no withdrawal of the specification by Mrs. Beck. The duty devolved upon the court to take prompt action to make certain that each defendant was adequately represented. We think the court should have exercised its own judgment and not been guided by defense counsel (who on the previous day had been of a contrary opinion) nor by the defendants themselves who were not competent to decide or solve the problem presented. A fair reading of the record indicates that, faced with the impossible task of defending two clients, each one of whom was seeking to throw the blame upon the other, counsel failed to properly protect the interest of Fernandez but seems to have subconsciously placed Mrs. Beck in a preferred position in the defense presented to the crime charged against them both. We shall refer only to two situations which developed upon the trial but which make this situation clear. When Mrs. Beck was upon the stand, under direct examination by counsel, she was asked whether from the time that she was slapped or touched by Mrs. Fay until the time when she was shaken by defendant Fernandez, she had any recollection as to what had happened. It will be recalled that it was

Fernandez' defense that when he came from the bathroom he found Mrs. Fay crouched upon the floor and Mrs. Beck in what appeared to be a daze and that he shook her to bring her to her senses and asked her what had occurred. In response to counsel's question Mrs. Beck said that she had no way of knowing what had occurred in the meantime. She said:

" I don't know whether he had been there and left or whether that was the first time. The first thing I remember is he was shaking me by the shoulders.

" Q. You don't know whether Mr. Fernandez came back into the living room and was attempting to blame you for anything in connection with Mrs. Fay's bleeding? * * *

" Q. There is no question you don't know what happened — you have no way of refreshing your recollection either — between the time that you had this discussion or argument or fight with Mrs. Fay up to the time that Mr. Fernandez asked you some questions? A. No, sir. * * *

" Q. Are you taking or have you taken the word of the defendant Fernandez as to what had happened, if anything, on that occasion? A. Now, what do you mean by that question?

" Q. When he was shaking you and he asked you certain questions concerning did you do it or what happened, are you taking the defendant Fernandez' word that something happened involving you and Mrs. Fay. A. It must have.

" Q. I say are you taking his word for it? A. Yes, I am."

Counsel realized at this point that he was leading his client Mrs. Beck into testifying to matters where every word she uttered tended to charge from her own lips that Fernandez had been guilty of the murder at a time when she had not been in possession of her faculties. If Fernandez had been represented by counsel of his own, the leading of this witness would not have occurred without objection. Counsel himself realized the situation that was developing, as far as Fernandez was concerned, for at the folio from which we have just quoted (Record, pp. 2586–2587) counsel asked that the record show that the " last few questions " asked of Mrs. Beck had been asked at the express request of Fernandez. Fernandez had not yet withdrawn the specification of insanity. The client for whom counsel had been assigned was thus trying the case rather than the assigned counsel.

Proof that the client for whom counsel had been assigned, Fernandez, as distinguished from the client by whom counsel had been retained, Mrs. Beck, was not, and could not be, adequately and properly represented is conclusively demonstrated by the following question and answer:

" The Court: Is it the opinion of Dr. Hoffmann that she [Mrs. Beck] is under the legal definition of insanity embodied in Section 1120, now a sane person and has been since the killing of Mrs. Fay?

" [Counsel]: No. His statement now to me is that she is still suffering from such a chronic defect of reason as to prevent her from knowing right or wrong when under the stress of her obsession; that she may have lucid intervals; she may act a certain way now; but even right now when she is under his domination, meaning the defendant Fernandez, she goes right back to that same set-up. That is Dr. Hoffmann's story to me now, and he is ready to testify as far as that is concerned. He says she may at times be able to consult with counsel and she may be able to —

" The Court: All of that should have been gone into before this case was tried." Thus was disclosed not merely hostility between the clients but domination of the client who had retained counsel by the client for whom he had been assigned. Yet these are the clients who *through counsel* sought to assure the trial court that they were " perfectly satisfied " with the legal representation afforded them.

The final complete abandonment of Fernandez by counsel and of the latter's defense, however, will be found in his summation. Counsel said: " * * * But, the only thing I am going to plead here is for *their life.* I plead for nothing else, believe me. I am not concerned with their liberty, I am concerned with their life. They are charged with a crime here punishable by death in the electric chair, and the only reason I stand here is to see that they do not go to the electric chair." (Emphasis supplied.) Here then was assigned counsel begging for the mercy of life imprisonment for a client whose defense was that he was an accessory after the fact for which the penalty was five years.

Due process which is guaranteed to each defendant in a criminal case includes the right to the aid of counsel. (N. Y. Const., art. I, § 6; U. S. Const., 5th & 6th Amendts.) In truth, Fernandez had no counsel and his conviction may not stand. (*Powell* v.

*Alabama,* 287 U. S. 45; *Glasser* v. *United States,* 315 U. S. 60; *People* v. *Hull,* 251 App. Div. 40.)

Returning now to the fact that the court was duly apprised of the conflict of interest here and was required to act thereon on the original heretofore quoted request of counsel, we quote in addition the following which occurred when the motion was made to dismiss at the close of the *People's case*:

" [Counsel] : In my duty as attorney in behalf of both defendants, if your Honor please, I would like to leave it to your Honor's discretion at this time if your Honor has any feeling that the rights of these defendants may conflict in any way at this time due to the proof that has been adduced at this trial. I ask your Honor to so state.

" The Court: What do you mean by that?

" [Counsel] : If your Honor feels due to the proof that has been offered in behalf of the Prosecution, including these alleged confessions, that the rights of these defendants in any way conflict, I ask your Honor in the interests of justice to so state at this time. &ast; &ast; &ast;

" The Court: Isn't it your duty to determine, as counsel for both defendants, under a responsibility which you voluntarily assumed, whether or not the interests of these defendants are in any way in conflict?

" [Counsel] : They didn't conflict at the beginning, but your Honor may be of the opinion that they conflict now due to the offer of the People's case.

" The Court: I make no ruling now.

" [Counsel] : Does your Honor rule that their rights conflict?

" The Court: I make no ruling now. It is your responsibility, the responsibility you faced when you became attorney of record for both of these defendants. You will remember at the very opening of the trial, as the record amply shows, I offered to assign counsel to assist you if for any reason you felt that such assistance might be desirable and necessary, and you have stated quite clearly you didn't think that you needed associate counsel or counsel to assist you.

" [Counsel] : *After the People's case is now in, I say in the interests of justice it is immaterial what my thoughts may be if your Honor is of the opinion that their rights conflict. If your Honor is of the opinion that their rights conflict, your Honor*

*should take affirmative action. I say that is immaterial of what
I may do. * * ***

"The Court: What do you suggest?

" [Counsel]: Your Honor could grant a severance to one of the defendants at this stage of the proceedings.

" The Court: At this time?

" [Counsel]: Yes, sir. At any stage of the proceedings.

" The Court: Motion denied.

" [Counsel]: Your Honor could declare a mistrial.

" The Court: Motion denied." (Emphasis supplied.)

It is urged that argument by counsel in this court with reference to the rulings of the Trial Judge on matters of conflict of interest reflect the benefit of hindsight employed from a vantage point long after the close of the trial. To our minds this is not an answer for it is one of the functions of our court in a capital case to look back to see if there was such a conflict of interest as to deprive defendants of a fair trial. Thus in *People* v. *Fisher* (249 N. Y. 419, 427) we said: " A retrospective view by an appellate court may reveal injustice or impairment of substantial rights unseen at the beginning." And again in the same case, quoting from *People* v. *Snyder* (246 N. Y. 491, 497) we said (p. 424): " The question always presented by such a motion [motion for a separate trial] is whether a jury can properly weigh the testimony upon the various issues which may arise. ' The decision of the trial court rendered before the trial is dictated by a reasonable anticipation based on the facts then disclosed. The decision of this court rendered upon a review of the trial itself rests upon determination of whether the prophesy has been realized.' "

We do not hold on this record that the original assignment of the counsel for Mrs. Beck to defend Fernandez was error as a matter of law, but we do hold that it was error for the trial court to fail to act promptly as soon as he was aware of the irreconcilable conflict of interests between the two defendants. The circumstances disclosed on this record rendered it impossible for Fernandez to have a fair trial. Our retrospective view clearly reveals an impairment of the substantial rights of Fernandez " unseen at the beginning " by the trial court.

We think there was a further error committed. The jury was selected from three panels totaling 650 veniremen in all. Coun-

sel for Fernandez on this appeal points out that on the *voir dire* examination of 32 veniremen, the court sustained challenges *for cause* made by the People upon the ground that the veniremen so challenged had indicated, by voice or upraised hand, that they were opposed to capital punishment.

We shall take an example in addition to the one mentioned at pages 318–319 of the opinion of Judge Lewis as indicating the procedure followed by the court. Three prospective jurors were asked the question whether they were opposed to capital punishment and each raised his hand to indicate that he was. The District Attorney challenged them for cause and the court sustained the challenge. Counsel for defendants sought to question them but the court refused to permit it saying:

" The Court: No. When jurors state they are opposed to capital punishment, the jurors are legally disqualified from sitting in a case of this character.

" [Counsel] : May I state the reason why I want to question the jurors?

" The Court: No; because it is not necessary. The mere statement by the three talesman, that they are opposed to capital punishment, is sufficient.

Counsel excepted and was given a " general exception " on this point. Exception was again taken by counsel when the defendants had exhausted their peremptory challenges, after the denial of the motion for a mistrial and to dismiss the entire panel, upon the ground that the refusal of the court to permit the opportunity of examination of prospective jurors concerning their views on capital punishment, had seriously prejudiced the rights of the defendants.

Defense counsel objected to the challenges for cause on the ground that a juror is not necessarily disqualified because he is opposed to capital punishment so long as he has no scruples which would interfere with his performance of his duty to determine guilt or innocence. The court, nevertheless, sustained the challenges " for cause " saying at one point: " Being opposed in principle, they can't serve ", and at another, as we have seen, " No. When jurors state they are opposed to capital punishment, the jurors are legally disqualified from sitting in a case of this character." Later this procedure was abandoned and proper questioning of talesmen by the court and counsel occurred.

It is most important for us to remember that the definition of acts which constitute crimes and all procedure for the trial and punishment therefor are regulated by statutes, within legislative competency under our Constitution. (*People* v. *Glen*, 173 N. Y. 395, 400.) Prospective jurors are selected and brought into court through the command and operation of statutes. Unless those statutes are followed there can be no proper jury to pass upon the guilt or innocence of a defendant. After the prospective jurors arrive in court they must be drawn by lot from a wheel in the custody of the clerk of the court. There may be no tampering with the wheel. The defendant is entitled to be tried by the first twelve competent, unbiased and qualified jurors drawn by lot. (*Hildreth* v. *City of Troy*, 101 N. Y. 234; *People* v. *McQuade*, 110 N. Y. 284.) Before quoting from the *Hildreth* case, we refer to the discussion in *People* v. *McQuade*, a criminal case, at pages 303 to 306, because on the last-mentioned page we find the following: " This court had occasion to consider this general subject in *Hildreth* v. *City of Troy* (101 N. Y. 234), and we adhere to the views then expressed."

The expression of views by Judge ANDREWS at page 239 of *Hildreth* v. *City of Troy* (*supra*) tersely and clearly sums up the theory of the applicable statutory law and when read in connection with chapter III of title VI of the Code of Criminal Procedure (§§ 359–387), to which we shall refer hereafter, clearly points up the error committed below. It is as follows: " The judgment should be reversed. The statute makes elaborate provision for securing an impartial jury. It provides that the first twelve competent jurors drawn, who are indifferent and not discharged or excused, shall constitute the jury. The law prescribes the qualifications of jurors. The court cannot add to, or detract from them. It cannot itself select the jury, directly or indirectly. It cannot in its discretion, or capriciously, set aside jurors as incompetent, whom the law declares are competent, and thus limit the selection of the jury to jurors whose names may be left. If this is done, a legal right is violated, for which an appellate court will give redress."

Section 377 of the Code of Criminal Procedure enumerates the causes for challenging prospective jurors for implied bias. Subdivision 8 of that section provides that in cases where the crime charged is punishable by death, if a juror has such an

objection to capital punishment " as would preclude his finding the defendant guilty; * * * [then] he shall neither be permitted nor compelled to serve as a juror." Section 376 of the code empowers the trial court " in the exercise of a sound discretion " to determine whether such an objection on the part of an individual juror would prevent him from deciding the issues impartially and without prejudice to the substantial rights of the challenging party.

While the statute permits of wide discretion on the part of the Trial Judge, proper procedure requires and permits, in the examination of each juror having a distaste for capital punishment, a further inquiry as to whether such an objection would prevent him from convicting a defendant of murder in the first degree carrying the death penalty if the evidence required such a verdict. (See *People* v. *Carolin,* 115 N. Y. 658; *People* v. *Wood,* 131 N. Y. 617.)

An accused is entitled to competent jurors drawn for jury duty in the manner provided for by the laws of our State. Such jurors should only be excused for legal cause or by peremptory challenge (*People* v. *McQuade,* 110 N. Y. 284, 305–306, *supra; Hildreth* v. *City of Troy,* 101 N. Y. 234, *supra*). While we cannot say that the trial would have resulted differently had these jurors not been excluded, it is probable that the jury would have been constituted differently. Jurors, we know, differ in intelligence, judgment and fitness and, for the sake of justice according to law, Trial Judges should adhere strictly to the rules of law and the methods of procedure governing their selection so as to secure the legal right of a party to have a jury selected from the competent ones as they are called from the jury box and to prevent any suspicion of an improper trial. The rejection of those 32 jurors without further examination on the sole ground that they were opposed to capital punishment was in contravention of the explicit provisions of section 377 of the Code of Criminal Procedure.

In *People* v. *Prior* (294 N. Y. 405) the question presented was whether a motion dismissing the indictments returned against the defendants should be dismissed because the grand jury which returned those indictments was illegally constituted. We answered that question in the negative and the following sentence in the concurring opinion of LEHMAN, Ch. J., states suc-

cintly the *ratio decidendi* (p. 413): '' The court has, however, no inherent or statutory power to set aside an indictment found by a grand jury because there were errors in applying the statutory method of procuring an impartial jury where the jury as impaneled conforms to the traditional concept of a grand jury and consists of a qualified group of men and women who represent a fair cross section of the impartial citizens of the county.''

The citation is not apposite here.

The judgment of conviction as to the defendants should be reversed and a new trial ordered.

DYE and FULD, JJ., concur with LEWIS, J.; DESMOND, J., concurs in separate opinion in which FROESSEL, J., concurs; CONWAY, J., dissents in opinion in which LOUGHRAN, Ch. J., concurs.

Judgments of conviction affirmed.   [See 301 N.Y. 690.]